RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE  4 / 28 / 14
        JDB

UNITED STATES DISTRICT COURT                                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


CHRISTOPHER GEORGE TAYLOR,        CIVIL ACTION
     Appellant                    1:12-CV-01756

VERSUS

U.S. COMMISSIONER OF SOCIAL       JUDGE JAMES T. TRIMBLE
SECURITY,                         MAGISTRATE JUDGE JAMES D. KIRK
     Appellee


## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Christopher George Taylor filed a claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") on May 21, 2003, when he was 26 years old, alleging a disability onset date of August 8, 2001 (Tr. p. 172) due to injuries sustained in an automobile accident (Tr. pp. 41, 63) ("back injury (herniated disc), back injury (stenosis)") (Tr. p. 186)). Those claims were denied by the Social Security Administration ("SSA") (Tr. p. 63).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on February 25, 2005, at which Taylor appeared with a medical expert, and a vocational expert ("VE") (Tr. p. 41). The ALJ found that, although Taylor has a severe impairment of chronic low back pain, he has the residual functional capacity to perform light work except that he can only walk for two hours in six, can sit for six hours in an eight-hour day, must be able to change positions every hour, cannot do repetitive stooping, crawling or climbing, cannot push/pull with the lower extremities, and cannot work around hazards such as heights or moving machinery (Tr. p.

48).  The ALJ concluded that Taylor can perform work which exists in substantial numbers in the national or regional economies such as telephone solicitor (295,575 jobs in the nation), check cashier (650,750 jobs in the nation), and information clerk (386,300 jobs in the nation) and, therefore, Taylor was not under a disability as defined in the Social Security Act at any time through the date of her decision on June 2, 2005 (Tr. p. 49).

On February 23, 2006, the Appeals Council remanded the case to the ALJ for a new hearing because the hearing recording was inaudible (Tr. p. 109).

A second de novo hearing was held before an ALJ on July 20, 2006 at which Taylor appeared with his attorney, a medical expert, and a vocational expert (Tr. p. 54).  The ALJ found that Taylor suffered from severe impairments of chronic lumbar strain with spinal stenosis and radiculopathy, which met or equaled Listing 1.04 of 20 C.F.R. Part 404, Subpart P, Appendix I from October 1, 2004 through the date of her decision on July 26, 2006, and awarded Taylor disability insurance benefits (Tr. pp. 57-58).

On July 25, 2008, the Appeals Council remanded the case to the ALJ for a new hearing because the hearing recording could not be located (Tr. p. 61).

A third hearing was held on March 23, 2009 (Tr. pp. 725-266), at which Taylor appeared with his attorney (Tr. p. 725), and a supplemental (fourth) hearing was held on July 20, 2010, at which Taylor appeared with a medical expert and a vocational expert (Tr. p. 767).  The ALJ found that Taylor suffers from severe impairments

2

of intervertebral disc disease, spinal stenosis, and chronic lumbar strain (Tr. p. 26), and that he was disabled within the meaning of the Social Security Act beginning on December 1, 2005 (Tr. pp. 33-34), but that he was not under a disability prior to December 1, 2005 (Tr. p. 33).  The ALJ found that, prior to December 1, 2005, Taylor had the residual functional capacity to perform a limited range of sedentary work; he was able to lift/carry ten pounds occasionally and less than ten pounds frequently, stand/walk two hours in an eight-hour workday, sit six hours in an eight-hour workday, had to be able to alternate sitting and standing about every hour, could not climb ladders, ropes or scaffolds, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and had to avoid exposure to vibration (Tr. p. 28).  The ALJ found that, prior to December 1, 2005, there were jobs existing in significant numbers in the national economy which Taylor could perform, such as data entry clerk (286,540 jobs nationally) and bench work assembler (330,839 jobs nationally) (Tr. p. 32).  The ALJ further found that, beginning on December 1, 2005 through the date of her decision on January 13, 2011, Taylor's impairments medically equaled Listing 1.04CC or 20 C.F.R. Part. 404, Subpart P, Appendix I, and that he was entitled to supplemental security income benefits (Tr. pp. 33-34).

Taylor requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 16) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

3

Taylor next filed this appeal for judicial review of the Commissioner's final decision. Taylor raises the following issues for review on appeal (Doc. 20):

> 1. The ALJ did not comply with Social Security Ruling 83-20 to determine the onset date of Taylor's disability.
>
> 2. The ALJ erred in suggesting that a change in his alleged onset date precludes the ALJ's obligation to determine the onset date and follow the framework of SSR 83-20.
>
> 3. The ALJ erred in adding additional steps to the five-step sequential process to evaluate whether Taylor is disabled.

The Commissioner responded to Taylor's appeal (Doc. 27), and Taylor filed a reply (Doc. 30). Taylor's appeal is now before the court for disposition.

<u>Eligibility for Benefits</u>

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an

application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

### Summary of Pertinent Facts

#### 1. Medical and School Records

Taylor was in a motor vehicle accident on August 11, 2001, and went to the hospital complaining of headache, trouble focusing, mild neck pain and mild upper back pain (Tr. p. 263). It was noted that Taylor ambulated normally and he was diagnosed with cervical muscle strain (Tr. pp. 263, 265-266). A C-spine taken on August 11, 2001 showed that Taylor's cervical spine was intact without acute fracture or traumatic mal-alignment and the soft tissues of his neck were unremarkable (Tr. p. 262).

Dr. Dean Lindsay, a chiropractor, stated that he treated Taylor for his injuries from the August 2001 accident and released him without restriction in December 2001 (Tr. p. 347). Dr. Lindsey also stated that Taylor returned to his clinic for treatment on January 18 and 24, 2002 for low back pain after playing basketball (Tr. pp. 347-350). Dr. Lindsey stated that x-rays showed loss of

the normal cervical curve with retro displacement of the fifth cervical vertebra and left rotation of the lower cervical vertebra, and diagnosed sprain/strain type injury to the lumbar and cervical spine resulting in lumbar, cervical and thoracic pain with radiculitis complicated by muscle spasms (Tr. pp. 348-349). Dr. Lindsey stated that Taylor had a 50-80% chance of long term residual pain in the cervical and thoracic spine due to damaged soft tissue that would produce scar tissue which would restrict motion and have a lower pain threshold (Tr. p. 349).

In March 2002, Dr. Robert K. Rush, an occupational medicine physician, evaluated Taylor for complaints of occasional pain in his upper back (Tr. p. 346). Dr. Rush noted Taylor's history of a motor vehicle accident, emergency room treatment the following day with cervical spine x-rays that were normal (Tr. p. 489), four months of chiropractic care, a brief period of physical therapy, and his self-employment as a computer game developer (Tr. p. 346). Dr. Rush found Taylor had a good range of motion of the cervical and lumbar spines restricted by lumbar paraspinal muscle tightness and tenderness, diagnosed residual lumbar strain, and prescribed physical therapy (Tr. p. 346). Taylor attended physical therapy from March 2002 through June 2002 (Tr. pp. 267-319). The physical therapist found Taylor had signs and symptoms consistent with a chronic lumbar weakness (Tr. p. 326), but progressed well and overall had minimal to no pain complaints (Tr. p. 448). The therapist noted Taylor's pain was primarily with or after significant activity and recommended continued work in a lumbar

strengthening program to minimize his pain and improve his level of function (Tr. p. 448).  In June 2002, Dr. Rush wrote that Taylor had completed an extensive course of reconditioning following his physical therapy, had experienced a decrease in his lower back pain, and was pursuing a therapist-directed home exercise program (Tr. p. 482).  Dr. Rush found Taylor had a good range of motion of the cervical and lumbar spines without restriction and could touch his toes with minimal difficulty, and released Taylor from his care to continue with the home exercise program and medication until it was gone, then to use over the counter anti-inflammatories as needed (Tr. p. 482).

In September 2002, Dr. Rush stated that Taylor had been released in June 2002 because he was essentially asymptomatic (Tr. p. 333).  Taylor returned to Dr. Rush in September 2002, complaining of intermittent pain; an MRI of Taylor's lumbar spine revealed spondylosis at L4/5 and L5/S1 with mild multi-factorial central canal stenosis from broad based disc bulges, but he had a good range of motion in the cervical and lumbar spines without restriction and could touch his toes without difficulty (Tr. p. 333).  Dr. Rush found the MRI changes represented pre-existing degenerative changes, probably exacerbated by the August 2001 accident (Tr. p. 333).

Taylor was enrolled in one college class in the summer 2002 semester (Tr. p. 259).  Taylor enrolled in college part time in Fall 2002 (three classes for nine hours), Spring 2003 (three classes for nine hours), Fall 2003 (four classes for twelve hours),

Spring 2004 (five classes for fifteen hours, summer 2004 (one class for three hours), Fall 2004 (four classes for twelve hours, Spring 2005 (two classes for six hours), and Fall 2005 (one class for three hours).

In January 2003, Dr. Rush stated that Taylor was essentially at maximum medical improvement without surgery, was continuing school and had a sideline computer business, and noted that Dr. John Cobb had recommended an L4/5 lumbar fusion due to anterior column failure at L4/5 and a possible compressive stenosis (Tr. p. 329). However, Dr. Cobb found Taylor had a full range of motion of the cervical spine with pain and leg raises to 90 degrees with minimal leg pain (Tr. p. 329). In February 2003 Dr. Rush stated that Taylor was at maximum medical improvement, he experienced back pain with activity but was fairly asymptomatic while sedentary, and he was continuing in school and had a job as a computer game developer, which activities did not required heavy physical exertion (Tr. p. 328). Dr. Rush stated that surgery may become necessary in the future (Tr. p. 328).

In August 2003, Dr. John Cobb, an orthopaedic surgeon, wrote that he had evaluated Taylor and recommended surgery, but that Taylor had elected to manage his pain nonsurgically (Tr. p. 280). X-rays in November 2002 showed a normal bony architecture of the lumbar spine, but an lumbar MRI showed a disc bulge at L4/5 and relative narrowing at L4/5 and L3/4 posterior from facet hypertrophy (Tr. pp. 388, 504). Dr. Cobb diagnosed chronic pos-traumatic lumbar pain syndrome creating primarily axial pain,

anterior column failure at L4/5, and possible compressive stenosis (Tr. p. 388, 504). Subsequent evaluation showed stenosis and anterior column failure at L4/5 (Tr. p. 383), and Dr. Cobb recommended a laminectomy, discectomy, and decompression at L4/5, reconstruction of the anterior column and posterior support with Stryker (Tr. p. 383). Dr. Cobb also wrote in August 2003 that Taylor has a "fairly significant disability involving his lower back, a combination of instability and spinal stenosis" resulting in a 25% permanent physical impairment of his body as a whole (Tr. p. 350). Dr. Cobb stated that Taylor was restricted to sedentary and light level activities, could lift up to 25 pounds occasionally, could not sit or stand for prolonged periods of time, could not engage in activities that would create postural stress to his back such as twisting and crawling, and could not be around unprotected heights (Tr. p. 380).

Dr. Michael Dole, a physical medicine and rehabilitation specialist, began treating Taylor in September 2003 (Tr. p. 473). Dr. Dole noted that Taylor had done heavy weight lifting prior to the accident and had a significant alteration in his physical activities after the accident, had not been able to work since the accident, and had been enrolled in college in order to get a job that would require lower physical demand (Tr. p. 473). Dr. Dole also noted that Taylor was playing basketball about every other week, taking a week off in between due to increased pain, that he had pain when he walked to and from classes, and that his pain was 10/10, aching and stabbing in his low back going down to his

9

posterior thighs with aching in his calves (Tr. pp. 473-474). However, Taylor had a basically normal lumbar myelogram in December 2002 (Tr. p. 474). Taylor was 6'2" tall, weighed 292 pounds, and reported a fifty pound weight gain (Tr. p. 474). Dr. Dole found that Taylor had low back pain, mechanical in nature, with radiation into both lower extremities and increased blood pressure, and prescribed Bextra and Lidoderm patches (Tr. p. 475). After several months of treatment, in October 2004, Dr. Dole wrote that Taylor reported his pain was better controlled with Kadian and his functional ability was improved (Tr. p. 451). Dr. Dole found that Taylor could function at a sedentary to light physical level, his pain interfered with his quality of life (though that was subjective), and he had objective evidence of tenderness to his low back as well as lumbar spinal stenosis (Tr. p. 451).

In January 2005, Dr. John Sandifer, an orthopaedic surgeon, evaluated Taylor for the state Disability Determination Services (Tr. pp. 490, 508). Dr. Sandifer found Taylor had a full range of motion in the cervical spine, 40 percent flexion in his cervical spine, difficulty extending even to neutral, positive straight leg raises, and noted that x-rays, an MRI and a CT scan showed spinal stenosis at L4/5, and x-rays of his cervical spine showed significant abnormalities (Tr. p. 491). Dr. Sandifer diagnosed chronic lumbar strain with probable spinal stenosis and mild radiculopathy affecting primarily the right leg, and recommended no repetitive bending, no lifting more than 15 to 20 pounds, no sitting more than 45 minutes to an hour at a time or more than four

10

to five hours in an eight hour day, no repetitive stooping, crawling or climbing, no repetitive foot control operation with the right lower extremity, and no standing more than 45 minutes to an hour at a time or more than five hours in an eight hour day (Tr. p. 491) (Tr. p. 491). Dr. Sandifer also limited Taylor's exposure to temperature extremes, humidity, wetness, and hazards such as machinery, and heights (Tr. p. 495).

Taylor's MRI in March 2005 showed a congenitally small central spinal canal in the lower lumbar spine with 10 mm AP diameters at the L4/5 and L5/S1 levels, degenerative signal changes with the L4/5 disc with mild concentric disc bulging but no focal disc herniation, and left posterior disc/spur complex at L5/S1 causing some extradural mass effect on the left anterior surface of the thecal sac as well as mild mass effect on the left S1 nerve root (Tr. p. 498).

Dr. Eubulus Kerr, an orthopaedic surgeon, examined Taylor in March 2005 and noted that his MRI showed a disc bulge at L4-5, congenital stenosis of the spine, degenerative changes at L4/5 and L5/S1, and moderate stenosis developing at L4/5 (Tr. p. 501). Dr. Kerr noted Taylor's complaints of back and right leg pain, that he sat in a forward bent posture to relieve some of his symptoms, and he had difficulty sleeping (Tr. pp. 500-501). Taylor had full lumbar flexion, painful extension at 10 percent, was tender to palpation along the right greater trochanter, his straight leg raise was positive on the right, and reported that pain was aggravated by sitting, rising from a seated position, prolonged

standing, walking, driving, and riding in a car (Tr. pp. 500-501).

Dr. Sandifer re-evaluated Taylor in December 2005 (Tr. pp. 510-511).   Dr. Sandifer noted that Taylor's back pain had progressively worsened, his back hurt all the time, and that his back pain was radiating into both legs, worse on the right (Tr. p. 510).   Dr. Sandifer stated that Taylor's condition had worsened because he was unable to buy any type of medication and was not taking anything but mild over-the-counter type analgesics (Tr. p. 510).   Dr. Sandifer noted that Taylor could not stand more than ten to fifteen minutes, could not walk very far, could not sit more than thirty minutes at a time, had difficulty standing straight up, was more comfortable sitting or standing with some flexion in the lumbar and thoracic spine regions, walked with a flexed posture in the thoracic and lumbar spine regions, had a normal cervical spine, was having muscle spasms in the lower lumbar regions his flexion was 30 degrees, lacked about 15 degrees on full extension, complained of pain on extension, and had positive straight leg raises (Tr. pp. 510-511).   Dr. Sandifer diagnosed chronic lumbar strain with spinal stenosis and radiculopathy affecting primarily the right leg with nerve root irritation affecting the left leg (Tr. p. 511).   Dr. Sandifer stated that Taylor should not do repetitive bending at the waist, repetitive lifting over ten to fifteen pounds, stand for more than fifteen to twenty minutes at a time or more than two hours in an eight hour day, do repetitive stooping, crawling, or climbing, stand more than twenty to thirty minutes at a time or more than three hours in an eight hour day, or

operate foot controls repetitively with either foot (Tr. p. 511).
Dr. Sandifer further noted that Taylor's condition appeared to have
worsened since he last saw him in January 2005 (Tr. p. 511).

Dr. George R. Smith, who apparently is a retired surgeon in
Lafayette, Louisiana (according to the online Yellow Pages),
reviewed Taylor's medical records and stated in a report that, when
Dr. Kerr examined Taylor in March 2005, Taylor walked slightly
flexed at the waist and his straight leg raise was positive in the
left leg (Tr. p. 526).   Dr. Smith further noted that, when Dr.
Sandifer evaluated Taylor in January and December 2005, Dr.
Sandifer found increasing lower back pain and increasingly
decreased range of motion of the lumbar spine, and increasing pain
with extension between January and December 2005 (Tr. p. 526).  Dr.
Smith also noted that Dr. Sandifer found that, by December, Taylor
had a definite decrease of the extensor hallucis longus muscle (in
his foot) and his straight leg raises were positive bilaterally,
his gait was normal but his posture while walking was increasingly
stooped (Tr. p. 526).   Dr. Smith stated that Taylor met Listing
1.04C as of December 7, 2005, when Dr. Sandifer last examined him
(Tr. p. 526).

In September 2007, Dr. Stephen Katz, an anaesthesiologist who
treated Taylor for pain, found that Taylor was doing extremely well
and not having a great deal of difficulty, he had returned to
school at Louisiana Tech, he was exercising and had lost forty
pounds, and he was on MSIR three times a day for breakthrough pain
(which Taylor said was too strong, so Dr. Katz suggested cutting

the dose in half) and Kadian twice a day (Tr. p. 639).  Dr. Katz planned to reduce the Kadian (Tr. p. 639).  In November 2007, Dr. Katz noted that Taylor had an increased amount of pain and discomfort because the Kadian had been decreased, so Dr. Katz increased the Kadian again (Tr. p. 606).  In December 2007, Taylor was doing better on the increased dose of Kadian (Tr. p. 598). However, in May 2008, Taylor reported that his medications were no longer strong enough, and Dr. Katz increased his Kadian and MSIR dosages (Tr. p. 579).  In September 2008, Dr. Katz found Taylor had gained a significant amount of weight, and that a neurosurgeon had given Taylor some surgical options (Tr. p. 561).

Dr. Vincent R. Forte, a pain care specialist, treated Taylor in April 2008, noted that he has lumbar disc disease and severe lumbar spinal stenosis with lumbosacral radiculopathy, opioid tolerance, and depressions, and referred Taylor to a neurosurgeon (Tr. p. 670).

In May and July 2008, Taylor was evaluated by Dr. Bernie G. McHugh a neurosurgeon (Tr. pp. 660-663).  Dr. McHugh stated that a CT myelogram had shown Taylor has a congenitally small canal, moderate to severe stenosis at L4/5 and L5/S1 with facet hypertrophy and ligamentous hypertrophy causing further decrease in the canal diameter, and claudication type symptoms (Tr. p. 660). Taylor also had disc degeneration at L4/5 and L5/S1 with disc protrusion (Tr. p. 663).  Dr. McHugh also noted that Taylor spends a lot of time in the flexed position which gives him good relief, and recommended a lumbar decompression (Tr. p. 660).

14

## 2. March 2009 Administrative Hearing

At the 2009 administrative hearing, Taylor testified that he last worked for a telemarketing company for about two months in 2001 (Tr. p. 737). Taylor also testified that he has difficulty going to sleep and staying asleep; he awakens after one or two hours, and averages about four hours of sleep a night (Tr. p. 742). Taylor testified that he has pain, numbness and weakness in his legs, and has problems sitting, walking and standing (Tr. p. 742). Taylor testified that, on average, his pain is 8/10 with his medications (Tr. p. 743). Taylor also testified that he is receiving weekly counseling and medication for depression (Tr. p. 744).

Taylor testified that, if he is not having a good day physically, he goes to the classes he has to go to and skips the other classes; Taylor planned in advance with his professors to do make up work on his bad days (Tr. p. 745). If Taylor does not have to go to class and is having a good day, he gets up and has breakfast; on a bad day, he takes his pain medicine and lies in bed until he is able to get up and eat breakfast (Tr. p. 745). Taylor testified that, on average, four days a week are bad days and three days a week are good days (Tr. p. 746). Taylor testified that he drives himself to the store about twice a week (Tr. p. 746). Taylor testified that he usually lives on campus in the dormitories, so he does not have to drive to class (Tr. pp. 746-747). Taylor testified that he currently is not in school and lives in a house next to campus (Tr. p. 746). Taylor testified

that he cannot carry very much, but he does not usually buy many groceries because he has a meal plan at the school and goes to the school cafeteria to eat (Tr. pp. 747-748).  Taylor testified that he is able to lift a gallon of milk (Tr. p. 747).  Taylor also testified that he goes to church about three times a year, goes out to visit friends or relatives about three times a week, and he has visitors about six times a week (Tr. p. 748).

Taylor testified that he cleans his apartment some on days that he is able to bend over, and that he can heat up food in the microwave, do laundry and fold clothes, and can carry the laundry basket to and from the laundry on good days (Tr. pp. 749-750).  Taylor testified that he can also wash dishes but he usually uses paper cups and plates (Tr. p. 750).  Taylor testified that he can take care of his personal needs (bathe, dress, groom) without assistance (Tr. p. 750).  Taylor testified that he watches about four hours of television per day, and that he can understand and follow what he is watching for two to three hours (Tr. p. 751).  Taylor also testified that he reads one to two hours per day, works on his computer about three hours per day (Tr. p. 752), and lies down five or six hours per day for pain relief (Tr. p. 762).

Taylor testified that he takes 200 mg of Kadian daily, which is sustained-action, 30 mg of MSIR daily, which is instant-release morphine, 300 mg of Wellbutrin, 20 mg of Lexapro, 3 mg of Lunesta, and an anti-inflammatory (Tr. pp. 755-756).  Taylor testified that his medication side-effect is constipation (Tr. p. 757).

Taylor testified that he can walk for about ten minutes, stand

16

for ten to fifteen minutes, sit for twenty to thirty minutes, climb stairs or go up steps, reach forward in front of him and over his head, pick up about fifteen pounds from a table-top, lean forward and straighten back up, kneel and squat (but he has difficulty getting back up), hold onto something that he picks up, pick up small items with his fingertips, button, snap, and zip (Tr. pp. 757-759). Taylor further testified that he can concentrate and pay attention on good days, and can follow simple one or two step instructions (Tr. p. 759). Taylor also testified that he can interact one-on-one with a supervisor, having coworkers sharing a space with him would be a problem, he can interact one-on-one with the general public, and he is not good with working in crowds, noise, and temperature extremes (Tr. pp. 760-761). Taylor testified that changing positions from sitting to standing is painful (Tr. p. 762).

Taylor testified that he had lost thirty to forty pounds in the last year due to poor appetite (Tr. p. 763). Taylor testified that doctors have discussed surgery with him but recommended waiting until it is absolutely necessary (Tr. p. 764). Taylor also testified that swimming is recommended for him, but he does not have access to a pool (Tr. p. 764).

3. July 2010 Supplemental Administrative Hearing

A supplemental hearing was held in July 2010 to obtain expert medical and vocational testimony (Tr. p. 769).

Taylor testified that he was 6' tall, weighed about 295 pounds, and was right-handed (Tr. p. 776). Taylor testified that

17

his blood pressure fluctuates with his pain, he does not take blood pressure medication, and he had a sleep study that indicated sleep apnea, so he uses a CPAP machine which helps him sleep better; he sleeps about six hours at night (Tr. pp. 781-782, 790). Taylor no longer takes Lunesta to help him sleep (Tr. p. 792). Taylor testified that sitting in a very scooped position, leaning forward, relieves his back pain (Tr. p. 783). Taylor testified that he takes Zoloft for his depression and has been seeing a psychologist for about two and a half years (Tr. p. 783); he sees a counselor every two weeks and the psychologist once every other month (Tr. p. 784). Taylor testified that his pain level has not changed in the last year (Tr. p. 784).

Taylor also testified that he moved to Ruston and no longer lives and eats his meals on campus (Tr. p. 786). Taylor testified that he does household chores slowly and take breaks (Tr. p. 788). Taylor testified that he may work for ten minutes, then lay down for ten to fifteen minutes before he resumes working (Tr. p. 788). Taylor testified that he meets with his pain doctor every three months (Tr. p. 791). Taylor testified that, instead of MSIR and Kadian, he now takes Oxycontin and Oxycodone for pain (Tr. p. 791). Taylor testified that he has been hurting since August 8, 2001 (the date of the accident) and that his pain has continuously worsened (Tr. p. 801).

Taylor testified that he can walk slowly for ten minutes before he starts hurting and has to sit down, can stand for ten minutes, can sit for twenty to thirty minutes, can walk up about

18

eight steps with a hand rail, can reach forward in front of him and over his head, and can pick up about fifteen pounds off of a table in front of him (Tr. pp. 794-795).  Taylor also testified that he can lean forward at the waist to stoop although it hurts, cannot kneel or squat, can hold onto things when he picks them up, can pick up small objects, and can button, snap and zip (Tr. pp. 795-796).  Taylor testified that he has difficulty concentrating most days, can follow simple one- or two-step instructions, and he has to lay down when his pain becomes too intense (Tr. p. 797).  Taylor reiterated that he can work one-on-one with a supervisor, he has a problem with sharing work space with coworkers, and he has some trouble dealing with the general public (Tr. pp. 797-798).  Taylor testified that temperature extremes and vibrations bother him (Tr. p. 798).  Taylor testified that he regained the weight he had lost, but has been swimming some for exercise (Tr. p. 799).

The medical expert, Dr. George W. Smith, summarized the medical records and testified that Taylor saw Dr. John Sandifer, an orthopedist, in January 2005 and in December 2005, and that Dr. Sandifer noted a change had occurred between the examinations (Tr. p. 805).  Dr. Smith testified that, in December 2005, Taylor walked with a flexed lumbar spine, sat in the flexed position, had a positive straight leg raise test and weakened extensor hallucis longus muscle, which is the muscle that allows you to dorsiflex your fifth toe and greatly assists in how you are able to dorsiflex your foot, affecting your gait (Tr. pp. 895-896).  Dr. Smith stated that he found Taylor met Listing 1.05 on the date of Dr. Sandifer's

19

last examination, December 27, 2005 (Tr. p. 807), and found that, as of the second hearing, Taylor's condition had stabilized but had not improved (Tr. p. 808).  Dr. Smith further stated that, before December 7, 2005, Taylor could do no more than light category work (Tr. p. 808).

The Vocational Expert ("VE") testified that Taylor's past work as a salesperson of books (DOT 277.357-034) was light work with an SVP 4,[1] his work as a telemarketer (DOT 299.357-014) was sedentary, SVP 3 and semi-skilled, and his work as a grocery clerk (DOT 190-477-018) was light and SVP 3 (Tr. p. 831).  The ALJ noted that Taylor had not done telemarketing work long enough for it to qualify as past relevant work (Tr. p. 832).

The ALJ posed a hypothetical involving a person between 25 and 33 years old, with about three years of college, who can do light work with limitations of lift/carry 20 pounds occasionally and 10 pounds frequently, stand or walk six hours in an eight hour day, sit for six hours in an eight hour day, pushing and pulling is limited by the ability to lift and carry, he cannot climb ladders, ropes or scaffolds, all other postures can only be occasional, and he must avoid exposure to vibration (Tr. p. 832).  The VE testified that such a person can do his past relevant work as a sales person and a grocery clerk (Tr. p. 832).

The ALJ then added the restriction that the claimant should work with things rather than people (Tr. pp. 832-833).  The VE testified that the person would not be able to do either of his

---

[1] Specific Vocational Preparation.

past relevant jobs, since they are both sales jobs (Tr. p. 833).
However, the claimant could work as a file clerk (SOC[2] 43-4071,
light semi-skilled, SVP 3, 214,590 jobs nationally and 2310 in
Louisiana) (Tr. p. 833).

The ALJ then restricted the claimant to sedentary work
(lift/carry ten pounds occasionally and less than ten pounds
frequently), stand/walk only two hours in and eight hour day, sit
six hours in an eight hour day, no climbing ladders, ropes or
scaffolds, other postures would only be occasional, and avoid
exposure to vibration (Tr. p. 833).  The VE testified that the
person could do work within SOC 43-9021 that is sedentary and
unskilled (286,540 jobs nationally and 2880 VCM[3]) (Tr. p. 833).
The VE also testified that the telemarketer job would be SOC 41-
9043, sedentary and SVP 3 (354,000 nationally and 1560 in
Louisiana) (Tr. p. 834).

The VE further testified that, with the additional restriction
of working with things rather than people, the claimant could do
bench work assembly jobs under SOC 51-2099[4] (330,940 nationally) or
data entry work (Tr. p. 834).

Finally, the VE testified that, if the person could not
maintain work activity for eight hours per day, five days per week

---

[2] Standard Occupation Classification system.

[3] The VE did not explain what "VCM" stands for.  It may be a
typographical error by the transcriptionist.

[4] Although the VE did not state what SOC 51-2099 stands for,
it apparently stands for miscellaneous assemblers and
fabricators.  See http://www.bls.gov/soc/2000/soc_u2j9.htm.

on a continuous, sustained basis, there would not be any jobs he could do (Tr. p. 835).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Taylor (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Taylor has not engaged

in substantial gainful activity since his alleged onset date of August 8, 2001, his disability insured status expired on March 31, 2005, and he has severe impairments of intervertebral disc disease, spinal stenosis, and chronic lumbar strain, but he did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 prior to December 1, 2005 (Tr. pp. 26)(Tr. p. 20).  The ALJ also found that Taylor is unable to perform any of his past relevant work (Tr. p. 32).

At Step No. 5 of the sequential process, the ALJ found that, prior to December 1, 2005, Taylor had the residual functional capacity to perform a wide range of sedentary work, and that he was able to lift/carry ten pounds occasionally and less than ten pounds frequently, could stand and walk up to two hours in a workday, could sit up to six hours in a workday, he had to have the option to alternate sitting and standing every hour, he could not climb ladders, ropes or scaffolds, and he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl (Tr. p. 28). The ALJ also found that Taylor is a younger individual with a high school education and that transferability of work skills was not relevant (Tr. pp. 20-21).  The ALJ concluded that, before December 1, 2005, Taylor could do work existing in significant numbers in the national economy such as data entry clerk and bench work assembler (Tr. p. 32).

The ALJ also concluded that, as of December 1, 2005, Taylor's impairments met or equaled Listing 1.04C and that he was disabled as defined in the Social Security Act from December 1, 2005 through

the date of the ALJ's decision on January 13, 2011 (Tr. pp. 33-34).

Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v.

<u>Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Law and Analysis</u>

<u>Issue 1 - Disability Onset Date</u>

Fist, Taylor contends the ALJ did not comply with Social Security Ruling 83-20 to determine the onset date of Taylor's disability.  Taylor contends that SSR 83-20 required the ALJ to find his disability onset date was August 8, 2001, the date he sustained traumatic injury in a car accident, because that was the date he began to have back problems.

The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations.  SSR 83-20, 1983 WL 31249, at *1 (S.S.A.1983).  Factors relevant to this determination include the claimant's allegation concerning the onset date, work history, and medical evidence.[5]  SSR 83-20, 1983 WL 31249 at *2.  Among these factors, "[t]he medical evidence

---

[5] In cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the Commissioner must infer the onset date, SSR 83-20 requires that the inference be based on an informed judgment.  The Secretary cannot make such an inference without the assistance of a medical advisor.  Spellman v. Shalala, 1 Fed. 357, 362 (5th Cir. 1993).

serves as the primary element in the onset determination."   SSR 83-20, 1983 WL 31249 at *2.  Also, <u>Spellman v. Shalala</u>, 1 F.3d 357, 361 (5th Cir. 1993).

For injuries of traumatic origin, onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in substantial gainful activity (SGA) (or gainful activity) for a continuous period of at least 12 months (see SSR 82-52, PPS-89, Titles II and XVI: Duration of the Impairment).   The fact that the claimant worked on the day of onset is not relevant, irrespective of the hours worked and money earned.   SSR 83-20, 1983 WL 31249, at *2.

It is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began. SSR 83-20, 1983 WL 31249, at *2.

Taylor contends his disability is traumatic in origin because

it was caused by the automobile accident.  However, although the automobile accident precipitated (or aggravated) Taylor's back problems, Taylor has not shown that he was expected to die as a result the accident or that he was expected to be unable to engage in substantial gainful activity for a continuous period of at least 12 months after the August 8, 2001 accident.  It appears that the accident, in combination with Taylor's congenitally small spinal canal, set in motion a slowly progressive degenerative disorder, spinal stenosis, that did not render Taylor disabled within (within the meaning of the Social Security Act) until sometime in 2005, as indicated by the medical evidence.  Taylor's doctors all agreed that he was capable of light to sedentary level activity within twelve months after the accident and beyond that.  The medical evidence shows that Taylor's stenosis was not disabling until sometime in 2005.  Compare <u>Richardson v. Astrue</u>, 2012 wl 5904733 (N.D.Cal. 2012); <u>Keener v. Astrue</u>, 2008 wl 6878132 (S.D. Ill. 2008).

Therefore, since Taylor did not carry his burden of proving he was  expected to die as a result of the August 8, 2001 motor vehicle accident or was expected to be unable to engage in substantial gainful activity for a continuous period of at least 12 months after the motor vehicle accident, he is not entitled to the inference that the date of his accident is his disability onset date.

Since Taylor has not carried his burden of proving he was disabled on August 8, 2001, this issue is meritless.

Issue 2 - Change in Onset Date

        Taylor also argues the ALJ erred in suggesting that his change
in the alleged onset date precludes the ALJ's obligation to
determine the onset date and follow the framework of SSR 83-20.
Taylor is referring to the fact that he originally claimed his
disability onset date was August 8, 2001 (the date of the
accident), but verbally amended his disability onset date to
October 1, 2004 at the second administrative hearing on July 20,
2006 (according to the 2006 ALJ's decision) (Tr. pp. 23, 54).
Taylor then reurged the August 8, 2001 disability onset date in his
request to the Appeals Council for review of the ALJ's 2006
decision; since the 2006 hearing recording could not be found, in
2008 the Appeals Council again remanded for a new hearing without
any instructions to the ALJ (Tr. pp. 61-62).   After the third
administrative hearing in 2009 and supplemental hearing in 2010,
the ALJ found Taylor's disability onset date was December 1, 2005.
Taylor now asks this court to find he was disabled on August 8,
2001.

        As already discussed above, Taylor is not entitled to a
presumption of disability on August 8, 2001 and did not prove he
was unable to work beginning on August 8, 2001.   Therefore, this
ground for relief is meritless.

Issue 3 - Five-Step Sequential Process

        Taylor also contends the ALJ erred in adding additional steps
to the five-step sequential process to evaluate whether Taylor is
disabled.   Taylor is apparently referring to the fact that the ALJ

28

made a bifurcated decision based on her finding that Taylor met a Listing 1.04(C)(spinal stenosis) on December 1, 2005, but was not disabled before that date.  Thus, the ALJ analyzed Taylor's claim in two parts-before December 1, 2005 and beginning on December 1, 2005.

Taylor contends the ALJ erred in finding he met a listing at Step 3, while also finding he could work at Step 4.  However, Taylor confuses the two separate time frames considered by the ALJ, which involved two different five-step analyses.  In the first five-step analysis, the ALJ found Taylor could work before December 1, 2005, at Step 4.  In the second, separate five-step analysis, the ALJ found Taylor met a listing on December 1, 2005, at Step 3, and was disabled beginning on that date.

Therefore, the ALJ did not add steps to the five-step sequential analysis.  Substantial evidence supports the Commissioner's findings that Taylor was not disabled before December 1, 2001 and was disabled beginning December 1, 2005.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Taylor's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being

served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this day of April 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE